SOL C. SIEGEL PRODUCTIONS, INC., A CALIFORNIA CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3565–63.   Filed April 6, 1966.

*Jacob Shearer*, for the petitioner.
*Edward M. Fox*, for the respondent.

The Commissioner determined deficiencies in petitioner's income tax in the amounts of $156,329.93 and $166,906.57 for the fiscal years ending May 31, 1958 and 1961, respectively.   The parties have agreed upon all items in dispute except one, namely, whether petitioner, a cash basis taxpayer, is chargeable, during its fiscal year ended May 31, 1961, with having realized $300,000 income, the right to which it had distributed to its shareholders during that year prior to collection, and which in fact was not paid to them until later years when due.

FINDINGS OF FACT

The stipulation of facts filed by the parties together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioner was a California corporation, organized under the laws of that State on June 7, 1954, for the purpose of engaging in the production of motion-picture photoplays.   Its president, chief executive officer, controlling stockholder, and head of motion-picture production, was Sol C. Siegel.   Petitioner's principal place of business was located in the county of Los Angeles, State of California.   Petitioner computed and reported its income upon the basis of a fiscal year ending May 31, using the cash receipts and disbursements method of accounting.   It filed its Federal income tax returns for the fiscal years involved with the district director of internal revenue at Los Angeles, Calif.

On or about April 13, 1955, petitioner entered into an agreement with Loew's, Inc. (hereinafter called Loew's), whose name has since been changed to Metro-Goldwyn-Mayer, Inc.   That agreement was reduced to writing on or about June 17, 1955, in the form of two

interdependent agreements, one referred to as the Production Distribution Agreement and the other as the Loan and Security Agreement. For convenience, the entire agreement between petitioner and Loew's is sometimes called the Loew's Agreement.

The Production Distribution Agreement provided that petitioner would produce four motion-picture photoplays and that Loew's would have the exclusive right to distribute these photoplays for a term of 21 years. Thereafter, subject to various mutual options, petitioner and Loew's could independently of each other, exercise such rights as the law afforded tenants in common in a copyright. With respect to the production of each photoplay, Loew's was to furnish financing for 75 percent of the negative cost and was to acquire title to a 75-percent undivided interest as a tenant in common in the photoplay. Petitioner was to furnish financing for the remaining 25 percent of the negative cost and was to acquire title to a 25-percent undivided interest as a tenant in common in the photoplay. The negative cost of each photoplay consisted of amounts necessarily or reasonably incurred as direct items of its cost of production, together with an overhead charge equal to 30 percent of all direct charges. The overhead charge was to be payable to Loew's for the use of its facilities and services.

With respect to the distribution of each photoplay, the Production Distribution Agreement provided that Loew's was to receive as its fee 30 percent of the gross receipts derived from exhibition in domestic territories and in the British Isles, 35 percent of the gross receipts derived from all other foreign exhibition, and 10 percent of the gross receipts derived from outright territorial sales. In addition, Loew's was to receive an amount equal to its actual distribution expenses.

With respect to the receipt and disbursement of gross receipts derived from the distribution of each photoplay, the Production Distribution Agreement provided that Loew's was to receive, account for, and disburse all receipts in the following order of priority: First, petitioner's 25-percent share of the negative cost was to be recouped; second, Loew's distribution fees and expenses were to be paid; third, Loew's 75-percent share of the negative cost was to be recouped. Any excess receipts would constitute the net profits from that photoplay. It was contemplated that photoplays would be produced in units of two. If one photoplay in a unit returned a net profit, that net profit was to be applied against the distribution fees and expenses and the negative cost of the second photoplay in the unit until all fees, expenses, and costs incurred in connection with the production and distribution of both photoplays in the unit had been recovered. Thereafter, all receipts less continuing distribution fees and expenses were to be distributed as the net profits of the unit, 75 percent to Loew's and 25 percent to petitioner.

The Loan and Security Agreement provided, with respect to financing the production of each unit of photoplays, that Loew's would lend to petitioner without interest the moneys necessary to finance 25 percent of the negative costs. The loan would be evidenced by a promissory note, secured by a first mortgage on petitioner's entire interest in the unit of photoplays. In the event the gross receipts from the distribution of the photoplays was insufficient to repay the loan, Loew's agreed to waive any right to a deficiency judgment with respect to the indebtedness and to look only to the collateral for satisfaction.

Under the provisions of the Loew's Agreement and prior to April 12, 1957, petitioner produced three photoplays, "High Society," "Man on Fire," and "Les Girls." The photoplays "High Society" and "Man on Fire" were produced pursuant to joint venture agreements between Bing Crosby Productions and petitioner, but as between Loew's and petitioner, they were considered to be produced and financed pursuant to the terms of the Loew's Agreement. On April 12, 1957, the Loew's Agreement was retroactively amended by an Amendatory Agreement which provided in general that petitioner's undivided interest in, and share of the profits of, all photoplays that had been, or would be produced under the Loew's Agreement would be 33⅓ percent instead of 25 percent. Loew's interest was correspondingly reduced from 75 percent to 66⅔ percent. The Amendatory Agreement further provided that the Loew's Agreement would be extended to cover an additional four pictures with an option to Loew's to add two additional photoplays. This agreement also provided for the production of the photoplay "Merry Andrew" in accordance with the terms and provisions of the Loew's Agreement, as amended, although certain rights in that photoplay were held by Danny Kaye, the star thereof.

On May 7, 1958, the provisions of the Loew's Agreement were again amended by a Supplementary Agreement which was to be effective as of April 12, 1957. This Supplementary Agreement provided that, for purposes of the Loew's Agreement, the photoplays "High Society" and "Man on Fire" would constitute one unit and the photoplays "Les Girls" and "Merry Andrew" would constitute another unit.

On or about September 5, 1957, petitioner entered into a joint venture agreement with HarBel Productions, Inc., with respect to the production, exploitation, and ownership of a motion-picture photoplay known as "The World, the Flesh and the Devil" (originally called "The End of the World"). By agreement between Loew's and petitioner, "The World, the Flesh and the Devil" was considered, as between Loew's and petitioner, to be produced and financed under the terms of the Loew's Agreement.

Prior to April 10, 1958, the officers of petitioner entered into discussions with officials of Loew's regarding the accounting for gross receipts and the allocation of production costs with respect to the

photoplays "High Society," "Man on Fire," and "Les Girls" which had been produced under the provisions of the Loew's Agreement. Petitioner's officers believed that certain discrepancies existed in Loew's method of accounting for receipts and expenses. Among other things, they contended that certain items which were charged directly to the picture should properly have been considered to be chargeable to overhead. Of the three photoplays, only "High Society" had recouped all its expenses and had returned a net profit. At the time of these discussions Loew's was desirous of hiring Sol C. Siegel as an executive in its own organization, and was therefore anxious to settle any disputes or differences of opinion which existed between petitioner and it with respect to previously produced photoplays.

On April 10, 1958, to settle the dispute between petitioner and Loew's and to provide for the employment of Sol C. Siegel by Loew's, three agreements were entered into: An Employment Agreement, a Sale Agreement, and a Second Amendatory Agreement further amending the terms of the Loew's Agreement.

The Employment Agreement provided that Loew's would employ Sol C. Siegel as its executive in charge of motion-picture production and motion-picture studio operations for a term of 3 years with option to renew for additional terms. On April 10, 1958, Sol C. Siegel entered upon his duties with Loew's and continued in the employ of Loew's until June 1962. Sol C. Siegel also continued in his capacities with petitioner in connection with the completion by petitioner of the motion-picture photoplays "The World, the Flesh and the Devil," "Some Came Running," and "Home From the Hill," which were subsequently produced pursuant to the Loew's Agreement, as modified. The Sale Agreement provided that petitioner would sell to Loew's its entire undivided interests in the photoplays "High Society," "Man on Fire," and "Les Girls" for $517,000. It further provided that Loew's would pay to petitioner the sum of $308,000 as petitioner's share of the distributable net profits from the photoplays as of the end of business April 10, 1958.

Prior to April 10, 1958, petitioner had completed the production of the motion-picture photoplay "Merry Andrew," which along with "Les Girls" was to constitute a unit under the Loew's Agreement, and had delivered it to Loew's for distribution. On March 27, 1958, Loew's released the motion picture "Merry Andrew" for exhibition, and on April 10, 1958, "Merry Andrew" was being exhibited in motion-picture theaters in the ordinary course of the practice of motion-picture distribution.

The Second Amendatory Agreement provided that the photoplay "Merry Andrew" would thereafter not constitute part of a unit with "Les Girls" but rather would constitute part of a new unit with "The World, the Flesh and the Devil" (then known as "End of the World")

which photoplay was then in production. The Agreement also provided for the production of another unit consisting of photoplays entitled "Some Came Running" and "I Thank a Fool." The photoplay "Home From the Hill" was subsequently substituted for "I Thank a Fool." With respect to these units the agreement provided in part as follows:

5. For the purpose of determining the net profits of the said four (4) photoplays produced or to be produced under the Extension Agreement, and for the purpose of recouping expenses of distribution and negative cost thereof the said photoplays shall be grouped in the following units of two (2) photoplays each and hereinafter referred to as Unit A and Unit B respectively, as below designated:

Unit A—"MERRY ANDREW
    "END OF THE WORLD"

Unit B—"SOME CAME RUNNING
    "I THANK A FOOL"
    or the substitute for
    either but not both of
    these photoplays

With respect to Unit A, the Distributor [Loew's] agrees that if both of the photoplays of said Unit shall be completed and delivered to Distributor, Productions' [petitioner's] share of the aggregate net profits from said Unit shall be not less than THREE HUNDRED THOUSAND DOLLARS ($300,000.00) and that if only one of the photoplays of said Unit shall be produced and delivered to Distributor, Productions' share of the net profits from said photoplay shall be not less than ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000.00). With reference to the receipt by Productions of its share of the net profits from the photoplays or photoplay of Said Unit A pursuant to the foregoing, it is agreed as follows:

(a) If on June 1, 1961, Productions' share of said net profits paid or payable to Productions shall be less than ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000.00), Distributor shall pay to Productions the amount by which $150,000.00 exceeds Productions' share of said net profits;

(b) If on June 1, 1962 both of the photoplays of said Unit have been delivered to Distributor and Productions' share of said aggregate net profits paid or payable to Productions shall be less than THREE HUNDRED THOUSAND DOLLARS ($300,000.00), Distributor shall pay Productions the amount by which $300,000.00 exceeds Productions' share of the net profits of said photoplay.

If the Distributor shall be required to pay Productions any amount on account of its undertaking hereunder and shall pay said amount, such shall be deemed to constitute a non-returnable payment to Productions on account of its share of the net profits from the photoplays in said Unit A. Subject only to the payments provided for in (a) and (b) above, the Distributor shall have the right to recoup any amounts so paid on account of its said undertaking out of Productions' share of the net profits from one or both (as the case may be) of the photoplays in said Unit at any time after the delivery of one or both (as the case may be) of the photoplays in said Unit.

If the second photoplay of said Unit A shall not be delivered to the Distributor on or before June 1, 1962 and shall be delivered subsequent to said date, the provisions of subdivision (b) preceding with reference to the time of payment

of Productions' share of the net profits from said photoplay shall be applicable but there shall be substituted for the June 1, 1962 date the date one year after the date of the delivery of said second photoplay.

With respect to Unit B, the Distributor does not represent or warrant that Productions shall receive any particular amount as its share of net profits or that there will be any net profits, but the Distributor hereby agrees that Productions shall be entitled to the first THREE HUNDRED THOUSAND DOLLARS ($300,000.00) of net profits from said Unit. In computing "net profits" for the purposes of this paragraph and of the two following paragraphs of this Article 5, it is, of course, understood that any participations payable to James Jones and other persons or companies participating in the receipts of the respective photoplay, shall be deducted, and only the net profits remaining after such deduction shall be considered "net profits" for the purposes of this and the succeeding paragraphs as aforesaid. After Productions shall have received said first net profits ($300,000.00) from said Unit, the Distributor shall then be entitled to the next SIX HUNDRED THOUSAND DOLLARS ($600,000.00) net profits from said Unit. After Distributor shall have received said SIX HUNDRED THOUSAND DOLLARS ($600,000.00) from said Unit, all further net profits shall be divided in accordance with the Distribution Agreement.

With respect to each of said units, it is understood and agreed that the net profits of one photoplay of the Unit shall be utilized for the recoupment of the expenses of distribution and negative cost of the other photoplay in said Unit, but the net profits of Unit A shall not be used to make up a deficit in Unit B or vice versa.

In the event any of the photoplays to be produced hereunder shall not be produced and delivered but shall become an abandoned property under and pursuant to the provisions of the Distribution Agreement, then unless pursuant to the provisions hereof a substitute photoplay shall be produced and delivered in place of the abandoned photoplay:

(i) If a photoplay of Unit A shall be so abandoned, then the said THREE HUNDRED THOUSAND DOLLARS ($300,000.00) above referred to shall be reduced by ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000.00);

(ii) If a photoplay of Unit B shall be so abandoned, then Productions shall be entitled to the first ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000.00) of net profits instead of THREE HUNDRED THOUSAND DOLLARS ($300,000.00) as above provided and the Distributor shall be entitled to the next THREE HUNDRED THOUSAND DOLLARS ($300,000.00) instead of SIX HUNDRED THOUSAND DOLLARS ($600,000.00) as above provided.

On or about February 2, 1959, petitioner substantially completed and, pursuant to the Production Distribution Agreement, as amended, delivered to Loew's the motion-picture photoplay "End of the World," which was released on or about April 23, 1959, by Loew's as "The World, the Flesh and the Devil" for exhibition in motion-picture theaters, and this distribution has been continued until the present time.

The two remaining photoplays, "Some Came Running" and "Home From the Hill," which made up Unit B under the Second Amendatory Agreement were released on December 18, 1958, and March 18, 1960, respectively.

On February 27, 1961, pursuant to prior discussions, proceedings were commenced for the voluntary dissolution and complete liquida-

tion of petitioner under the provisions of the California Corporations Code regarding the winding up and dissolution of California corporations. In connection with these proceedings, petitioner, on February 27, 1961, adopted a plan of dissolution, and on March 27, 1961, there was filed with the director of internal revenue on Form 966 of the Internal Revenue Service a return of information under section 6043 of the Internal Revenue Code. On March 21, 1961, a certificate of election of petitioner to wind up and dissolve was filed with the secretary of state of the State of California.

On March 21, 1961, petitioner's stock was owned by the following persons in the stated percentages: Sol C. Siegel, 85.0524 percent; Ethel B. Siegel (wife of Sol C. Siegel), 4.4764 percent; and John Patrick, 10.4712 percent. On that date, petitioner executed and delivered to its shareholders a general assignment which assigned to them undivided interests in all of petitioner's assets other than cash and other than its interest in a contract with John Patrick, one of its shareholders and a well-known and experienced writer of plays for stage and screen. The contract provided that John Patrick would write five screenplays within a period of 7 years for which petitioner would pay him $80,000 per screenplay at the rate of $40,000 per year for 10 years. As of February 1961, John Patrick had completed three of the five screenplays contemplated by the agreement.

Included in the assets assigned to its shareholders were all petitioner's right, title, and interest in and to the motion-picture photoplays entitled "Merry Andrew," "The World, the Flesh and the Devil," "Some Came Running," and "Home From the Hill." In addition on the same date, petitioner executed and delivered to its shareholders separate assignments of undivided interests for each of the motion-picture photoplays.

The formal assignments in favor of petitioner's shareholders Sol C. Siegel and Ethel B. Siegel as to each of the motion-picture photoplays were respectively recorded in the Copyright Office of the United States of America on May 29, 1961. On May 10, 1961, petitioner gave Loew's notice of the assignment by it of the motion-picture photoplays "Merry Andrew," "The World, the Flesh and the Devil," "Some Came Running," and "Home From the Hill." Oral notice of such assignments had been given to an officer of Loew's shortly after March 21, 1961.

On or about, but not prior to, June 1, 1961, Loew's paid to Sol C. Siegel, John Patrick, and Ethel B. Siegel an aggregate of $150,000 pursuant to the provisions of paragraph 5(a) of the Second Amendatory Agreement. On or about, but not prior to, June 1, 1962, Loew's paid to Sol C. Siegel, John Patrick, and Ethel B. Siegel an aggregate of $150,000 pursuant to the provisions of paragraph 5(b) of the

Second Amendatory Agreement. As stated in those provisions of the agreement, the payments were made in regard to the motion-picture photoplays "Merry Andrew" and "The World, the Flesh and the Devil" (referred to therein as "End of the World").

The negative cost of the motion-picture photoplay "Merry Andrew," as reflected on the books of Loew's was $2,464,488 which included the 30-percent overhead charge. As of March 16, 1961, Loew's books indicated that $1,313,624.45 of the negative cost had not yet been recouped. Between March 16, 1961, and July 30, 1964, an additional $193,862.45 of the negative cost was recouped as shown on Loew's books leaving $1,119,762 of the original negative cost, or approximately 45-percent unrecouped. "Merry Andrew" had been in distribution as of July 1964, for a period exceeding 6 years, and to the date of trial had still not, according to the books of Loew's, recouped its negative cost.

The negative cost of the motion-picture photoplay "The World, the Flesh and the Devil," as reflected on the books of Loew's, was $1,635,887 including the 30-percent overhead charge. As of March 16, 1961, Loew's books indicated that $1,412,963.21 of the negative cost had not been recouped. Between March 16, 1961, and July 30, 1964, an additional $53,662.21 of the negative cost was recouped as shown on Loew's books, leaving $1,359,301 of the original negative cost, or approximately 83-percent unrecouped. "The World, the Flesh and the Devil" had been in distribution as of July 1964, for a period exceeding 5 years and to the date of trial it had still not, according to the books of Loew's, recouped its negative cost.

The major portion of receipts from the exploitation of a motion-picture photoplay, exclusive of reissues, re-releases, revenues from television and other collateral rights, can normally be expected to be received within 3 years from the date of release of said photoplay.

The contract between petitioner and John Patrick was, as previously stated, specifically excepted from the assets assigned by petitioner to its shareholders on March 21, 1961. During the year 1962, petitioner attempted to effect a settlement of its rights and obligations under its contract with John Patrick but was unsuccessful. Ultimately, John Patrick wrote a screenplay for a picture called "Feather in Her Hat" which was subsequently sold. John Patrick was allowed to retain the proceeds of that sale in return for the cancellation of his contract which event occurred about March or May 1963. Upon the cancellation of that contract, petitioner completed its liquidation and dissolution. Petitioner filed income tax returns for the fiscal years ended May 31, 1962 and 1963.

OPINION

Raum, *Judge:* On March 21, 1961, about 1 year after the release of the last photoplay required to be produced under the Loew's

Agreement, as amended, petitioner, pursuant to a plan of dissolution, assigned to its shareholders all of its right, title and interest in and to "Merry Andrew," "The World, the Flesh and the Devil," and the remaining two photoplays which made up the other unit produced under the Second Amendatory Agreement. However, petitioner was unable to complete its liquidation and dissolution until sometime in 1963, and it filed income tax returns for its fiscal years ended May 31, 1962 and 1963. At the time of the assignment, petitioner had a fixed right under paragraph 5 of the Second Amendatory Agreement to receive net profits in the aggregate amount of $300,000 in respect of the foregoing two named photoplays; and payments totaling $150,000 each were in fact made by Loew's to petitioner's stockholders on or shortly after June 1, 1961, and June 1, 1962, in accordance with the provisions of paragraph 5. The question before us is whether the $300,000 thus paid to petitioner's stockholders may be included in its gross income for its fiscal year ending May 31, 1961.

Petitioner argues first that the profits involved were derived from the photoplays which had already been transferred to the stockholders, and therefore could not be attributed to the corporation at all, and second that, in any event, such profits could not be charged to the corporation, a cash basis taxpayer, in its fiscal year ending May 31, 1961, before the payments were in fact made.

Petitioner's first point appears to rest upon highly doubtful grounds. When it made the March 21, 1961, assignment to its stockholders, its right to receive the $300,000 profit, as we read paragraph 5 of the agreement, had become indefeasibly fixed, and only a lapse of time until June 1, 1961, and June 1, 1962, was to occur prior to actual payment. It had performed all the services required of it under the Loew's Agreement, as amended, and had only to await the expiration of the allotted period of time to collect its guaranteed income. In the circumstances, since petitioner's right to the profits had already become fully vested and since the operation of the statute in this area does not turn upon "attenuated subtleties," it would seem that petitioner could not avoid tax on such profits by any kind of "anticipatory arrangements and contracts however skillfully devised." *Lucas* v. *Earl*, 281 U.S. 111, 114, 115; *Harrison* v. *Schaffner*, 312 U.S. 579, 581, 582, 583; *Helvering* v. *Horst*, 311 U.S. 112; *Helvering* v. *Eubank*, 311 U.S. 122; *Commissioner* v. *First State Bank of Stratford*, 168 F. 2d 1004 (C.A. 5); *Wood Harmon Corporation* v. *United States*, 311 F. 2d 918 (C.A. 2). However, it is not necessary to render any definitive decision on this point, since in our view petitioner is not chargeable with the income in question for its fiscal year ending May 31, 1961, the only year before us in respect of this issue.

Ordinarily, in deflection of income cases, a cash basis assignor is accountable for his assigned income in the year in which it is paid

rather than in the year in which he makes the assignment. Thus, in *Helvering* v. *Eubank*, 311 U.S. 122, the assignments of the renewal commissions were executed in 1924 and 1928, but the commissions in issue were paid to the assignees in 1933, the year in which they were held taxable to the assignor. Similarly, in *Harrison* v. *Schaffner*, 312 U.S. 579, the life beneficiary of a trust in December 1929 and November 1930, assigned to her children specified amounts of income of the trust for each of the years following the respective assignments, and she was held accountable in 1930 and 1931, respectively, for the amounts which were thus paid over to the children pursuant to the prior year assignments. To be sure, as the Government contends, there is language in *Helvering* v. *Horst*, 311 U.S. 112, susceptible of an interpretation that would support charging the assignor with realized income in the year of assignment. But no such problem was before the Court in *Horst*, since the bond coupons therein matured and were paid during the same year that the taxpayer gave them to his son. And since *Horst* and *Eubank* were companion cases, decided on the same day, it cannot be assumed that the Court intended in its *Horst* opinion to lay down any such rule as that for which the Government argues herein. Indeed, in *Eubank* the Court concluded its opinion as follows (311 U.S. at 125):

> For the reasons stated at length in the opinion in the *Horst* case, we hold that the commissions were taxable as income of the assignor *in the year when paid.* * * * [Emphasis supplied.]

The problem as to whether a cash basis taxpayer may be charged with income for the year in which he parted with his right thereto was specifically considered in *Annie A. Colby*, 45 B.T.A. 536, where it was held that interest that was already due in December 1935, when it was assigned, could not be attributed to the taxpayer for that year where it was in fact paid to the donees in 1936 and 1937. The effect of the language in *Horst*, relied upon by the Government herein, was explicitly taken into account and found inapplicable. *Colby* was followed in *Ida S. Austin*, 6 T.C. 593, 596–597, affirmed 161 F. 2d 666 (C.A. 6), certiorari denied 332 U.S. 767, and we follow it here. See also *Commissioner* v. *First State Bank*, 168 F. 2d 1004, 1010 (C.A. 5); *Estate of H. H. Timken*, 47 B.T.A. 494, 510–513, affirmed 141 F. 2d 625 (C.A. 6).

Finally, the Commissioner seeks to support his position by reliance upon section 446(b) of the 1954 Code.[1] His theory is that the

---

[1] SEC. 446. GENERAL RULE FOR METHODS OF ACCOUNTING.

(a) GENERAL RULE.—Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) EXCEPTIONS.—If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary or his delegate, does clearly reflect income.

$300,000 must be included in petitioner's income for the fiscal year ending May 31, 1961, in order to "clearly reflect income." In effect the Commissioner has attempted to place petitioner on an accrual basis of accounting in respect of the $300,000 item, without otherwise disturbing petitioner's cash basis. Of course, the Commissioner has broad discretion under section 446(b), and the burden is upon the taxpayer to show that there has been an abuse of that discretion. *Idaho First National Bank* v. *United States*, 265 F. 2d 6, 9 (C.A. 9). We think the record herein clearly establishes that there is no ground whatever for reliance upon section 446(b) and that resort thereto would amount to an abuse of discretion.

Petitioner employed the cash basis of accounting. There is no contention that this method of keeping its books and reporting income did not clearly reflect its income. If petitioner had not made the assignments in controversy there is not the slightest suggestion that the two $150,000 payments, which would otherwise have been made directly to it during its fiscal years ending May 31, 1962, and May 31, 1963, would not have been properly chargeable to it for those years. There is thus totally absent any ground for allocating these payments to an earlier taxable year.

To be sharply distinguished are those cases in which the corporation was liquidated *prior* to the payments in controversy. In such situation there would be a distortion if fully earned but unpaid income were not included in the taxpayer's income prior to dissolution, and the Commissioner would thereby be amply justified in resorting to section 446(b). It is this circumstance that explains such cases as *Williamson* v. *United States*, 292 F. 2d 524 (Ct. Cl.); *Idaho First National Bank* v. *United States*, 265 F. 2d 6 (C.A. 9); *United States* v. *Lynch*, 192 F. 2d 718, 721 (C.A. 9), certiorari denied 343 U.S. 934; *Susan J. Carter*, 9 T.C. 364, affirmed 170 F. 2d 911 (C.A. 2); *Floyd* v. *Scofield*, 193 F. 2d 594, 596 (C.A. 5). Petitioner herein was in existence during and filed returns for its fiscal years ending May 31, 1962 and 1963, when the payments in issue were made, and there is no justification for allocating them to some other taxable period.

*Decision will be entered under Rule 50.*