CLYDE G. TATUM AND VETA RAE TATUM, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3456–64. Filed September 22, 1966.

*William H. Evans*, for the petitioners.
*James F. Hart*, for the respondent.

OPINION

DAWSON, *Judge:* Respondent determined deficiencies in the income taxes of petitioners for the taxable years 1961 and 1962 in the amounts of $954.75 and $1,135.52, respectively. The sole issue for decision is whether petitioners, who gave to certain charitable organizations negotiable warehouse receipts evidencing sharecrop rents, must include in their gross income the amounts received by the donees for the crop shares in the taxable years when they were reduced to money or its equivalent.

All of the facts have been stipulated by the parties. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference and adopted as our findings.

Clyde G. Tatum and Veta Rae Tatum (hereafter called petitioners) are husband and wife residing in Lubbock, Tex. They filed joint Federal income tax returns with the district director of internal revenue at Dallas, Tex., for the years 1961 and 1962, utilizing the cash receipts and expenditures method of accounting on a calendar year basis.

Shortly prior to October 13, 1961, the petitioners made a donation of one-third of 80,480 pounds of milo grain to Lubbock Christian College. The grain was sold by the college on October 13, 1961, for its market value of $402.40. The donation was effected by the delivery to the donee of negotiable warehouse receipts, which is the proper method of delivering possession of warehoused grain.

Shortly prior to December 10, 1961, the petitioners made a donation of 3 bales of cotton to Lubbock Christian College. The cotton was sold on December 10, 1961, by the college for its market value of $467.14. Such donation was effected by the delivery to the donee of negotiable warehouse receipts and cotton classing cards, which is the proper method of delivery of possession of warehoused cotton.

Shortly prior to December 27, 1961, the petitioners made a donation of 6 bales of cotton to the Broadway Church of Christ of Lubbock, Tex. On or about such date the church sold the cotton for its market value of $984.34. Such donation was effected by the delivery to the donee of negotiable warehouse receipts and cotton classing cards.

Shortly prior to December 28, 1962, the petitioners donated 12 bales of cotton to Lubbock Christian College. The cotton was sold by the college on December 28, 1962, for its market value of $1,830.37. Such donation was effected by the delivery to the donee of negotiable warehouse receipts and cotton classing cards.

Shortly prior to December 31, 1962, the petitioners donated 2 bales of cotton to Lubbock Children's Home, Lubbock, Tex. On December 31, 1962, the home sold the cotton for its market value of $313.12. Such donation was effected by the delivery to the donee of negotiable warehouse receipts and cotton classing cards.

All of the items of grain and the cotton above described were received by petitioners as payments in kind of farm rents from tenants who rented petitioners' farmlands on a sharecrop rental basis.

There was a verbal rental agreement between the petitioners as landlord and their respective tenants. It provided that the tenants would pay the expense of producing crops upon petitioners' lands, except for a certain percentage of the fertilizers and insecticides that might be used in farming the lands. The agreement also provided that upon the harvesting of the crops, the tenants would pay as rent to the petitioners one-third of all the grain and one-fourth of all the cotton and cottonseed produced upon the lands. This arrangement is typical of sharecropping farmlands to cotton and grain. The landlord also pays his respective percentage of insecticides and fertilizers used, e.g., one-third of the insecticides and fertilizers used for the grain crop, and one-fourth of the insecticides and fertilizers used for the cotton crop. The landlord and tenant mutually plan the amount and location of crops on the lands and the matters of applications of fertilizer, insecticide, and water. The tenant performs all the work and pays all expenses, except as stated above. The landlord's share of the produce is delivered for his account as ginned cotton at a gin, and as harvested grain at a grain warehouse or elevator.

Petitioners did not include in gross income, as reported in their Federal income tax returns for the years in issue, the values of the grain and cotton delivered to the charitable organizations but did deduct them as charitable contributions.

Lubbock Christian College, Broadway Church of Christ, and Lubbock Children's Home are each charitable organizations as defined in section 170(c), I.R.C. 1954. Petitioners are entitled to deduct gifts to these organizations in accordance with the provisions of section 170.

The taxpayers' allocated cost of production to the crops donated in 1961 was $268.32, and in 1962 was $268.78. These two respective cost items were deducted by petitioners as farm expense in the years 1961 and 1962. Petitioners have agreed that they overstated farm expenses in the amounts of $268.32 for 1961 and $268.78 for 1962 if the Court determines that they did not realize taxable income from the donated sharecrop rents.

Although this Court has not previously considered this particular issue, we have examined from time to time many problems relating to assignment of income concepts.

Petitioners contend they are treated as farmers under all the applicable provisions of the Internal Revenue Code of 1954 and the regulations thereunder.[1] They also contend that the donated crop shares in question were chattels created through the instrumentality of their

---

[1] All section references will be to the Internal Revenue Code of 1954, or the regulations thereunder, unless otherwise indicated.

farming and thus represented unrealized appreciation, not rental or future income in the income tax sense. They then argue that since it is settled law that farmers do not realize income because of their gifts of harvested crops, there is no sound basis for taxing to them as income the proceeds received by the charitable donees from the sales of the crop shares.

Respondent, on the other hand, claims that the favorable treatment accorded sharecrop rents is a matter of administrative convenience which should not be extended to petitioners under these particular circumstances. He further contends that all significant events necessary for petitioners to realize gross income from the gifts of the crop shares occurred in each of the years 1961 and 1962, i.e., the crop shares were harvested and paid to petitioners as rents, they were assigned to the charitable donees, and they were sold by the donees for cash.

It is true that for many purposes the Code and regulations provide that sharecrop landlords are to be treated as farmers [2] and the crop shares they receive as rents are to be treated as farmers' harvested crops.[3] It is likewise true that farmers do not realize income because of their gifts of harvested crops.[4] However, the analogy between farmers and sharecrop landlords is not complete and we think the receipt of the crop shares here involved resulted in the receipt of rental income by the petitioners and did not represent unrealized appreciation in the value of property.

Respondent relies mainly on the case of *Helvering* v. *Horst*, 311 U.S. 112 (1940), and his own Rev. Rul. 63–66, 1963–1 C.B. 13. The

[2] See e.g., sec. 175, relating to soil and water conservation expenditures. Sec. 1.175–3, Income Tax Regs., which defines "the business of farming," provides that "a taxpayer who receives a rental (either in cash or in kind) which is based upon farm production is engaged in the business of farming." See also sec. 180 and sec. 1.180–1 relating to expenditures by farmers for fertilizer, etc.; sec. 182, relating to expenditures by. farmers for clearing land, and sec. 1.182–2, relating to definition of "the business of farming"; sec. 6073, relating to time for filing declarations of estimated income tax by individuals, and sec. 1.6073–1(b)(2), relating to farmers, which provides, "If an individual receives for the use of his land income in the form of a share of the crops produced thereon such income is from farming."; sec. 6420, relating to gasoline used on farms.

[3] Sec. 1.61–4 [Income Tax Regs.] Gross income of farmers.

(a) *Farmers using the cash method of accounting.* * * * Crop shares (whether or not considered rent under the State law) shall be included in gross income as of the year in which the crop shares are reduced to money or the equivalent of money.

(b) *Farmers using an accrual method of accounting.* * * * Crop shares (whether or not considered rent under the State law) shall be included in gross income as of the year in which the crop shares are reduced to money or the equivalent of money.

 *  *  *  *  *  *  *

(d) *Definition of "farm".* * * * For more detailed rules with respect to the determination of whether or not an individual is engaged in farming, see § 1.175–3.

[4] See *Campbell* v. *Prothro*, 209 F. 2d 331 (C.A. 5, 1954) (gift of cattle to charity held not a realization of income by the donor of the gift); *White* v. *Brodrick*, 104 F. Supp. 213 (D. Kan. 1952) (gift of wheat to charity not a realization of income by donor); *Elsie SoRelle*, 22 T.C. 459 (1954) (gift of land with matured wheat crop about one week prior to harvesting did not cause realization of income by the donor); *Estate of W. G. Farrier*, 15 T.C. 277 (1950) (gift of cattle to child held no realization of income by the donor). See also I.T. 3910, 1948–1 C.B. 15 (gift of zero basis crops by farmer causes realization of income by donor), revoked by Rev. Rul. 55–138, 1955–1 C.B. 223, and I.T. 3932, 1948–2 C.B. 7 (gift of zero basis cattle by farmer causes realization of income by donor), revoked by Rev. Rul. 55–531, 1955–2 C.B. 520.

ruling holds that where an individual, by gift, transfers warehouse receipts evidencing crop shares received as rent for the use of farmlands, he must include in gross income the amounts received by the donees for the sharecrop rents in the taxable years in which they convert the crop shares to cash. The deductibility of the crop shares as a charitable contribution is not questioned by respondent.

In *Helvering* v. *Horst, supra*, the owner of bonds detached the interest coupons and delivered the coupons as a gift to his son who procured payment. The issue, as stated by the Supreme Court, was "whether because one who in fact receives payment for services or interest payments is taxable only on his receipt of the payments, he can escape all tax by giving away his right to income in advance of payment." In holding that the donor was taxable on the amount of interest received by his son, the Supreme Court said (311 U.S. at 118) :

The power to dispose of income is the equivalent of ownership of it. The exercise of that power to procure the payment of income to another is the enjoyment, and hence the realization, of the income by him who exercises it.

Section 61(a), I.R.C. of 1954, provides that "gross income means all income from whatever source derived," and includes "rents." Section 1.61–4, Income Tax Regs., provides that "Crop shares * * * shall be included in gross income as of the year in which the crop shares are reduced to money or the equivalent of money," whether the sharecrop landlord uses the cash or accrual method of accounting.

Here the parties have stipulated that the items of grain and cotton donated to the charities "were received by the petitioners as farm rents paid in kind by farm tenants for the petitioners' farmlands so rented on a sharecrop rental basis." Moreover, the crops were converted to cash by the donees in the year they were received by the petitioners and donated to the charitable organizations. At all times the petitioners owned the land on which the crops were grown but merely assigned their right to the crop rents to third parties who reduced them to cash. Under such circumstances it is clear that petitioners must include the sharecrop rents received in 1961 and 1962 in their gross income. See *Davison's Estate* v. *United States*, 292 F. 2d 937 (Ct. Cl. 1961), certiorari denied 368 U.S. 939, where the proceeds from the sale of crop rents of a decedent were treated as income and taxed to the estate as income in respect of a decedent in the year in which the crops were reduced to cash by the estate. After referring to section 61(a)(5) and section 1.61–4, Income Tax Regs., the Court of Claims made this observation (292 F. 2d at 942) :

The lessor who has received crop-rent has of course received an asset of value, but as a matter of administrative convenience the recognition of this value as income is deferred until the crops are reduced to money. Crops received as rent exist in the hands of the lessor as a unique kind of property which can be described, like a right to receive future income, as a potential income asset.

The opinion in *Davison's Estate* fortifies our view that the assignment or donation of the sharecrop rents was an assignment of future income rather than an assignment of the unrealized appreciation in value of an inventory item, such as raised crops or cattle held for sale. The mere fact that the sharecrop rents were sold by the donees, rather than by the petitioners, does not prevent their inclusion in petitioners' gross income.

Petitioners cite *Campbell* v. *Prothro*, 209 F. 2d 331 (C.A. 5, 1954), and *White* v. *Brodrick*, 104 F. Supp. 213 (D. Kans. 1952), to support their position. Both of these cases stand for the same proposition as Rev. Rul. 55–531, 1955–2 C.B. 520, *Estate of W. G. Farrier*, 15 T.C. 277 (1950), and *Elsie G. SoRelle*, 22 T.C. 459 (1954), viz, a farmer, manufacturer, or other producer does not realize income upon disposition of a raised, produced, or inventoried item by gift. All of these cases relating to gifts of inventoriable items are different from the instant case. The distinguishing factors here are (1) the rental feature of the sharecrop rents and (2) the exercise of the sharecrop landlord's power to procure payment of such rental income to the charitable donees. Unlike the animals involved in *Prothro* or the wheat in *White*, the crop shares received by petitioners represented rental income and not the unrealized appreciation in the value of property.

Petitioners point out in their brief that they might have fed the grain to cattle or other livestock and that it is not uncommon for the tenant to deliver to the landlord a share of garden crops, eggs, or beef for consumption by the landlord and his family. They then ask: Does the landlord reduce tomatoes, blackeyed peas, or fresh beef to money when he consumes them on his table? In deciding this case we need not answer the question. Matters of taxation are determined by what actually happened. *Island Gas, Inc.*, 30 T.C. 787 (1958). We will not deal with abstract questions. The petitioners did not consume the crops; they gave away their crop shares to charitable organizations. Moreover, since the assignment of the crop shares and their sale by the donees occurred in the same taxable year, we need not consider the problems which might arise if the two events happened in different taxable years. Cf. *Sol C. Siegel Productions, Inc.*, 46 T.C. 15, 24 (1966).

Finally, petitioners call our attention to the recent District Court decision in *Peterson, et ux* v. *United States*, an unreported case (E.D. Wash. 1965, 65–2 U.S.T.C., par. 9674) which, on substantially the same facts as we have before us here, reached the opposite result. However, based on what we have said in this opinion, we state with candor that we disagree with the result reached in the *Peterson* case and prefer not to follow it.

Reviewed by the Court.

*Decision will be entered for the respondent.*

SIMPSON, *J.*, dissenting: I have concluded that the body of law regarding charitable contributions requires me to dissent from the opinion of the majority.

The treatment of charitable contributions of unreported income has a long and controversial history. Several efforts have been made to require taxation of such income for which a charitable deduction is claimed or to restrict the deduction to the basis of the contributed property; yet, all these efforts have been unsuccessful. An attempt at legislation was made by the House of Representatives in 1938, when it approved a provision limiting the deduction to the basis of contributed property; but the Congress as a whole rejected the provision.[1] An administrative attempt was made by the Internal Revenue Service when it issued I.T. 3910, 1948-1 C.B. 15, requiring a farmer to include in gross income the fair market value of agricultural products which he contributed to charity, but that attempt was rejected by the courts. *Campbell* v. *Prothro*, 209 F. 2d 331 (C.A. 5, 1954); *White* v. *Brodrick*, 104 F. Supp. 213 (D. Kans. 1952). The Treasury has accepted these decisions by providing in the regulations that a manufacturer or supplier can deduct his selling price (sec. 1.170–1(c), Income Tax Regs.; cf. Rev. Rul. 55–138, 1955–1 C.B. 223, revoking I.T. 3910, *supra*). In 1963, when the President proposed that the unrealized appreciation in value of property be taxed upon a gift of the property, a contribution to charity was expressly excepted from the proposal. See H. Doc. No. 43, 88th Cong., 1st Sess., p. 20 (1963). Thus, it has become well established in our law that when there is a charitable contribution, the deduction is measured by the value of the contributed property, and there is no requirement that the unrealized income be reported.

As a Court, we must interpret the law so as to carry out its purposes with intelligence and responsibility. At times we must chart the way; but at other times the path is staked out for us, and then our course is circumscribed. For my part, I cannot see that this case is in substance distinguishable from the precedents. However much one may agree, or disagree, with those precedents, I believe that we should not grasp at what appears to me to be an insubstantial distinction to bring about a different result. In connection with this situation, it seems to me that both the Administration and the Congress have acquiesced in the practice of not reporting income as a result of a contribution of property to charity. Those precedents establish the law, and I believe that we have no sufficient reason in this case for not following them. If the Congress wishes a different result, the change should be brought about by legislation.

---

[1] H. Rept. No. 1860, 75th Cong., 3d Sess., p. 20 (1938); S. Rept. No. 1567, 75th Cong., 3d Sess., p. 14 (1938); Conf. Rept. No. 2330, 75th Cong., 3d Sess., p. 35 (1938).