Sol C. SIEGEL, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

Ethel B. SIEGEL, Plaintiff-Appellee,

v.

UNITED STATES of America, Defendant-Appellant.

Nos. 26398, 26399.

United States Court of Appeals, Ninth Circuit.

July 11, 1972.

As Amended on Denial of Rehearing Aug. 25, 1972.

Ernest J. Brown (argued), Harry Baum, Joseph M. Howard, Scott P. Crampton, Asst. Atty. Gen., Washington, D. C., Mason C. Lewis, Asst. U. S. Atty., Robert L. Meyer, U. S. Atty., Los Angeles, Cal., for appellant.

Jacob Shearer (argued), of Shearer, Fields, Rohner & Shearer, Los Angeles, Cal., for appellees.

Before KOELSCH, WRIGHT, and TRASK, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

In these actions for refund of income taxes, the issue presented is whether fixed guaranteed amounts unconditionally payable to Sol C. Siegel Productions, Inc. under a motion picture production contract constituted taxable income to the corporation in the taxable years the income was collected, notwithstanding that the corporation reported its income on the cash basis and had assigned its right to receive the income (by way of a liquidation distribution) to its shareholders (the taxpayers-transferees) who then collected it. The Commissioner had attacked the distribution as an anticipatory assignment of income earned by and taxable to the corporation. The district court gave judgment to the plaintiffs. We reverse.

Mr. Siegel, a producer of motion pictures, was president and controlling shareholder of Productions. That corporation formed a joint venture in 1955 with Loew's Inc., a major studio, for the production and distribution of a number of photoplays. The terms of the agreement were complex,[1] but provided basically that Productions would furnish its skill in making films and Loew's would pay the production costs and would distribute the end product.[2] The two companies would own the photoplays as tenants in common of a copyright and would divide any profits.

A significant amendment was added in 1958, when Loew's agreed to guarantee payment to Productions of $300,000 in exchange for the completion and delivery of two specified photoplays.[3] The

---

1. A detailed account of the business dealings between Loew's and Productions may be found in Sol C. Siegel Productions, Inc. v. Commissioner, 46 T.C. 15 (1966), a related case.

2. Actually, Productions was to "furnish" financing for 25 percent of the film cost, but Loew's agreed to loan the necessary money to Productions interest free. The "loan" would be secured by a first mortgage on Productions' interest in the photoplays. Loew's agreed to look only to this collateral for security, and to waive any right to a deficiency judgment if gross receipts from the films were insufficient to repay the loan. Given this arrangement, we think it realistic to say that Loew's alone financed the productions.

3. The contract expresses the guarantee in these terms:
   "With respect to Unit A [two specified films], the Distributor [Loew's] agrees that if both of the photoplays of said Unit shall be completed and delivered to Distributor, Productions' share of the aggregate net profits from said Unit shall be not less than THREE HUNDRED THOUSAND DOLLARS ($300,000) . . . .
   (a) If on June 1, 1961, Productions' share of said net profits paid or payable to Productions shall be less than ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000), Distributor shall pay to Productions the amount by which $150,000 exceeds Productions' share of said net profits.

right of Productions to receive that amount became fixed when the plays were finished, but payment was deferred. Loew's was to pay $150,000 on June 1, 1961, for the first film, and a like amount for the second film on June 1, 1962. The first picture was completed and delivered early in 1958, the second by February 1959.

Well before the first payment became due in 1961, Productions began proceedings for voluntary dissolution. On March 21, 1961 the corporation delivered to its shareholders a general assignment that gave them undivided interests in all its assets, other than cash and a contract with a screenwriter. These assets included Productions' ownership interest in the photoplays it had produced pursuant to the joint venture with Loew's, as well as the contractual right to receive payment of $300,000. Loew's later paid the $300,000 to the shareholders on schedule.

The corporation kept its accounts on the cash receipts and disbursements basis, and adopted a fiscal year ending May 31. Mr. and Mrs. Siegel asserted that the $300,000 did not constitute income to the corporation, because it had assigned away its income right prior to the fiscal year in which Loew's paid it. They sought by this device to avoid taxation at the corporate level and to realize capital gain on the receipt of the $300,000. Upon distribution of the contractual right to receive the income, the shareholders would receive a fair market value basis in the right, paying a capital gain tax on the difference between their adjusted stock basis and the fair market value of the income right. When the

$300,000 was paid the shareholders would pay tax at the ordinary rate upon only the difference between their stepped up basis in the contractual right and the amount of the payment. The result would be to transform income from the production and distribution of movies, normally ordinary income, into capital gain.

The Commissioner first attacked this transaction by asserting that the $300,000 should be included in Productions' gross income for the fiscal year in which the assignment occurred. The Tax Court disagreed, holding that since the corporation continued to exist and file federal tax returns for several more years the appropriate time for taxation should be the date of payment rather than the date of the assignment. Sol C. Siegel Productions, Inc. v. Commissioner, 46 T.C. 15 (1966).

The Tax Court has determined *when* the right to these payments generated income. Our problem is to determine whether the corporation or its shareholders should have reported that income.

This case presents an intersection between two general doctrines in assignment of income theory. It has been held that income from property is taxed to the owner of the underlying property right at the time the income accrued. *See, e. g.,* Helvering v. Horst, 311 U.S. 112, 118–119, 61 S.Ct. 144, 85 L.Ed. 75 (1940); Blair v. Commissioner of Internal Revenue, 300 U.S. 5, 57 S.Ct. 330, 81 L.Ed. 465 (1937). On the other hand, it has been held that income should be taxed to its earner. *See, e. g.,* Helvering v. Eubank, 311 U.S. 122, 61 S.Ct.

(b) If on June 1, 1962, both of the photoplays of said Unit have been delivered to Distributor and Productions' share of said aggregate net profits paid or payable to Productions shall be less than THREE HUNDRED THOUSAND DOLLARS ($300,000), Distributor shall pay Productions the amount by which $300,000 exceeds Productions' share of the net profits of said photoplays. If the Distributor shall be required to pay Productions any amount

on account of its undertaking hereunder and shall pay said amount, such shall be deemed to constitute a *non-returnable payment* to Productions on account of its share of the net profits from the photoplays in said Unit A. (emphasis supplied)
This non-returnable advance does not represent Productions' share of the photoplays' profits, since payment is in no way contingent upon the existence of any net profits.

149, 85 L.Ed. 81 (1940); Lucas v. Earl, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930). These intra-family gift decisions establish the basic framework for inquiry into assignments of income problems.[4] Subject to certain qualifications not here relevant, assignment of income principles apply to corporate distributions as broadly as they do to intra-family gifts.[5]

Courts have had difficulty in deciding into which category a given item of income falls, since the line between earned income and income from property is not always marked with dazzling clarity. An example is the situation found here, in which a taxpayer employs its skills to create a valuable property interest in the photoplay copyrights.

The Siegels argue that the $300,000 guarantee represents income produced by their property interest in the photoplays. They characterize the payment as rental paid by Loew's for exclusive control over the manner of exploitation of the photoplays throughout the 21 year distribution period contemplated by the contract. They contend this arrangement is analogous to an agreement by one cotenant to allow another the exclusive possession of their jointly held property for a term of years. Applying Justice Holmes' classic metaphor, they say the payment is the fruit of the tree representing their property right in the photoplays.[6] It follows, they say, that the income must be taxed to whoever owned the property at the time of payment.

The Commissioner views this transaction in an entirely different aspect, arguing that the right to the payment was fully earned by the corporation when it completed and delivered the two photoplays, long before the time of as-signment. From this perspective, the $300,000 represents a guaranteed minimum compensation to Productions in return for its services in creating the photoplays. The Commissioner also argues that the corporation should be taxed even if the $300,000 is treated as income from property.

■ An owner of property cannot escape taxation on its income by transferring the property in the interval between the time the income accrues and the time it is paid. *See, e. g.,* United States v. Lynch, 192 F.2d 718, 721 (9th Cir. 1951), cert. denied, 343 U.S. 934, 72 S.Ct. 770, 96 L.Ed. 1342 (1952) (corporation distributed right to receive warehouse storage fees for goods stored in months prior to the liquidation); Idaho First National Bank v. United States, 265 F.2d 6 (9th Cir. 1959) (bank transferred to its shareholders notes which had accrued overdue interest).

Yet if the $300,000 payment is rental paid by Loew's in return for Productions' agreement to allow Loew's exclusive control over exploitation of their jointly held copyright, then we assume the $300,000 would not have been fully earned until the expiration of the 21 year distribution period. For this reason the cases cited by the Commissioner are inapposite, and we cannot accept his theory that the corporation had fully earned the right to the $300,000 even if the payment is considered rental.

We also declined to adopt the approach taken by the district court, which appears to have interpreted the guarantee as a mere reshuffling of priorities on receipts of the films' earnings. That is, instead of applying money from exhibition of the movies initially to costs of production and distribution, the first $300,000 in earnings from the films

---

4. *See* Lyon & Eustice, Assignment of Income: Fruit and Tree As Irrigated by the P. G. Lake Case, 17 Tax L.Rev. 295, 296–301 (1962).

5. *See* Lyon & Eustice, *supra* note 5, at 396–98.

6. Lucas v. Earl, 281 U.S. 111, 115, 50 S.Ct. 241, 74 L.Ed. 731 (1930).

would be given to Productions as a return on its property interest.

We reject this approach primarily because the guarantee is expressly severed from any dependence on the earnings of the films. As we read the contract, the $300,000 was to be paid without regard to the financial success or failure of the films. It was not payable from any specified fund; rather Loew's became unconditionally obligated to make the future payments on completion of Productions' services in making the photoplays.

The Siegels seek to support the district court's decision by reference to frustration-of-contract cases, which hold that performance of a contract will be excused upon the destruction of an object or person whose existence provided the basic purpose of the contract. *See, e. g., La Cumbre Golf and Country Club v. Santa Barbara Hotel Co.,* 205 Cal. 422, 271 P. 476 (1928). The taxpayers argue, and the district court apparently agreed, that destruction of the photoplays prior to exhibition would effectively cancel the obligation to pay $300,000. No express condition in the contract so provides. A judicial decision about whether to imply such a condition must necessarily beg the question presented about the nature of the payments.

If the payments promised were in exchange for Productions' services, then the $300,000 would be payable even though the completed films were never exhibited. If the payments were rentals for the 21 year distribution period, then destruction of the film would probably excuse performance of the promise. In short, the frustration-of-contract cases do nothing to advance analysis of our assignment of income question, for either position begs the basic question involved here.

The Tax Court, in dictum, adopted the Commissioner's view of the transaction.

When the Commissioner first attacked this distribution, the Siegels had argued to the Tax Court (1) the payment could not be taxed to the corporation in any event since title had passed to the shareholders, and (2) the Commissioner had chosen the wrong tax year. Although it rested its decision upon the second ground, the Tax Court did express its opinion on the assignment of income question:

"Petitioner's first point appears to rest upon highly doubtful grounds. When it made the March 21, 1961, assignment to its shareholders, its right to receive the $300,000 profit, as we read paragraph 5 of the agreement, had become indefeasibly fixed, and only a lapse of time until June 1, 1961, and June 1, 1962, was to occur prior to actual payment. It had performed all the services required of it under the Loew's Agreement, as amended, and had only to await the expiration of the allotted period of time to collect its guaranteed income. In the circumstances, since petitioner's right to the profits had already become fully vested and since the operation of the statute in this area does not turn upon 'attenuated subtleties,' it would seem that petitioner could not avoid tax on such profits by any kind of 'anticipatory arrangements and contracts however skillfully devised.' Lucas v. Earl, 281 U.S. 111, 114, 115 [50 S.Ct. 241, 74 L.Ed. 731]; Harrison v. Schaffner, 312 U.S. 579, 581, 582, 583 [61 S.Ct. 759, 85 L.Ed. 1055]; Helvering v. Horst, 311 U.S. 112 [61 S.Ct. 144, 85 L.Ed. 75]; Helvering v. Eubank, 311 U.S. 122 [61 S. Ct. 149, 85 L.Ed. 81]; Commissioner v. First State Bank of Stratford, 168 F.2d 1004 (C.A.5); Wood Harmon Corporation v. United States, 311 F.2d 918 (C.A.2)." Sol C. Siegel Productions, Inc. v. Commissioner, 46 T.C. 15, 23 (1966).

We believe this to be the correct approach. The arrangement between .

Loew's and Productions was essentially a joint venture. Loew's furnished cash, studio facilities, its distribution network, and its expertise in sales promotion. Productions furnished the talents of Sol Siegel and his production crew. The joint venturers produced several movies for which Productions received only its percentage share of any profits earned by the films after all costs had been recovered. Then the 1958 amendment minimized Productions' entrepreneurial risk by guaranteeing it a minimum return of $300,000 in return for its contribution to the joint venture.

In these circumstances we believe the guaranteed income right payable from one joint venturer to the other should be treated as compensation for the latter's contribution to the project. Productions did not incur the full risk associated with ownership of rights in movies whose profitability was highly speculative.

To the extent that the Loew's guarantee shielded Productions from the risk normally associated with ownership of unreleased movies, we think it reasonable to treat Productions as the beneficiary of a contract right to receive earned income, rather than as a joint venturer receiving income from ownership of property. At least in the context of the movie industry, insulation from financial risk is a helpful touchstone for characterizing transactions in which elements of earnings for services are commingled with elements of return upon ownership of property.

We conclude that the corporation had fully earned the $300,000 prior to the date it assigned the right to receive the payments. Accordingly the Commissioner correctly determined that the payments must be included in the gross income of the corporation.

The judgment of the district court is reversed.