Ben F. Parmer and Mildred Helen Parmer v. commissioner.
Parmer v. Commissioner
Docket No. 5020-70.
United States Tax Court
T.C. Memo 1971-320; 1971 Tax Ct. Memo LEXIS 12; 30 T.C.M. (CCH) 1372; T.C.M. (RIA) 71320; December 21, 1971, Filed. Thornton H. Thomas, Jr., Thomas & Thomas, P.O. Box 128, Burlington, Colo., and Richard D. Thomas, for the petitioners. Marvin T. Scott, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the taxable *13 years 1966, 1967, and 1968 in the respective amounts of $3,186.36, $2,109.25, and $7,735.44. One issue having been conceded by respondent, there remain for decision the following issues: (1) Whether certain property sold by one of petitioners during the years here in issue was held primarily for sale to customers in the ordinary course of his trade or business 1373 so as to cause the gain to constitute ordinary income rather than capital gain; and (2) Whether petitioners realized income during 1968 when Limon Bible Chapel Association, Inc., sold farm commodity warehouse receipts donated to it by petitioner Ben F. Parmer. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners Ben F. and Mildred Helen Parmer are husband and wife who at the time of filing their petition herein resided in Burlington, Colorado. They filed joint Federal income tax returns for the taxable years 1966, 1967, and 1968 with the district director of internal revenue, Denver, Colorado. Petitioners keep their books and report their income on the cash basis of accounting. Ben F. Parmer, hereinafter referred to as petitioner, has been engaged in farming since *14 1935. As of the date of the trial of this case he owned approximately 8,000 acres of land in the vicinity of Burlington, Colorado. Most of this land is farm or grazing land, the major farm crops produced from the land being wheat, corn, and sugar beets. Burlington is located in Kit Carson County in eastern Colorado near the Kansas border. The population of Burlington in 1960 was about 2,500 and in 1970 the population was approaching 3,000, the increase having been spread rather evenly over the intervening 10 years. Petitioner lived in the town of Burlington and for several years prior to 1961 had wanted to purchase a tract of land close to Burlington. He wanted to place corrals on the land for use in his cattle business. In June 1961 petitioner entered into an agreement with Consolidated Gas and Equipment Co. of America for the purchase of a little less than three-fourths of a section of land (approximately 455 acres) adjacent to the southern edge of Burlington for $72,800 or a per-acre cost of $160. On July 14, 1961, the property was conveyed to petitioner. When the land was purchased it was all farm ground and winter wheat was growing on a portion of it. Petitioner took possession *15 of the fallow portion immediately and the portion where the winter wheat was growing immediately after harvest. He then began farming the land himself with his own equipment, primarily in winter wheat. Shortly after acquiring the land petitioner dug a well in the northwest quarter of his land to furnish water for irrgation. He also placed a pump on two wells which were in the very northwest corner of the southwest quarter. Unknown to petitioner at the time, those wells were in the path of proposed Interstate Highway 70 (hereinafter referred to as I-70), which at that time was in the planning stage, and the wells were later moved a few hundred feet to the southwest. Of petitioner's 8,000 acres, he personally farms about 1,200 acres and has nearly 1,000 acres for livestock grazing. The remainder of the land is operated by sharecroppers. Petitioner has an understanding with these sharecroppers that they will comply with Federal commodity regulations. If one sharecropper violates the laws, all, including petitioner might be ineligible for the program's benefits. Petitioner also places some limitation on how the land operated by the sharecroppers can be pastured. Petitioner typically *16 would enter into a written lease contract with the sharecroppers providing that they could farm his land in return for a percentage of the crop. Petitioner under some of the lease contracts, agreed to bear a percentage of the cost of fertilizer and other expenses. Generally, it was understood that the operator would occasionally confer with petitioner about the operation of the farm. At harvest time or shortly thereafter, the sharecropper would haul the crop of wheat or corn to a public warehouse or to the petitioner's own graineries. At the warehouse, the warehousemen would weigh the grain and determine how many bushels were to be stored. He would then issue a scale ticket jointly in the names of the "operator" (the lessee who grew the grain) and the "landowner" (petitioner). The quantity of grain placed in storage would then be entered in a "Grain Book" which contains a separate ledger sheet for each fiscal year with the names of both the operator and the landowner listed thereon. Either party can request issuance of a warehouse receipt to either himself or to a third party at any time thereafter. When the holder of the warehouse receipt presents it for payment, he is paid for *17 the grain based on the market price at the time of sale less storage and other charges. A check for the net amount is then issued by the warehouseman that issued the receipt who in turn adjusts the appropriate ledger account. 1374 From July 1961 until September 1963 petitioner personally farmed the three-fourths section he had acquired in July 1961. On September 26, 1963, petitioner leased a little over 400 acres of land to Hinkhouse Brothers, approximately 50 acres at that time being in the process of being annexed to the city of Burlington under circumstances hereinafter set forth. Since that date the land has been farmed by Hinkhouse Brothers. At approximately the same time that petitioner acquired his three-fourths section, the school board of Burlington School District Area 6-J, an area which covered the town of Burlington and 20 miles to the north, 22 miles to the south, 14 miles to the east, and 6 miles to the west of the town, decided that the area needed a new high school. Petitioner had no knowledge of the school board's decision. The board hired an architect from Colorado Springs to design a school and the board secretly selected several alternate sites around *18 Burlington for the proposed school. The architect selected a portion of petitioner's newly acquired land because it met desired features such as sufficient acreage and proper drainage. The architect had knowledge that highway I-70 would pass through the center of petitioner's land and he divulged this information to the school board. This latter feature convinced the board that petitioner's land was the best site for the new school as the location would be an advertisement for the school system. In April 1962, the president of the school board (Reinecker) contacted petitioner at the latter's home one evening to broach the idea of petitioner's selling some of his land for a school site. Petitioner was most unreceptive to the idea. Reinecker told petitioner that the board wanted a site which would border on I-70. This was the first time that petitioner learned that the proposed new highway was planned to bisect his property. After several more visits, petitioner became more receptive to the idea of selling a part of his land to the school district. Although condemnation was never discussed, this power, of course, existed in the hands of the school board. On May 10, 1962, petitioner *19 granted the school district an option to purchase 34.6 acres of his land for a school site. Petitioner received $2,000 as consideration for the option which was to run for one year and could be exercised by the payment of an additional $18,000. The option could be extended for an addtional year for $1,000. Prior to the time of granting the option to the school district, petitioner had turned down an offer from a private party to purchase several acres for $500 per acre. The site which was agreed on was bounded on the south by the I-70 right-of-way and on the east by a line which ran along the route of Burlington's 16th Street extended. Petitioner was not pleased with the site selected for the school because it left him with a strip of land approximately 300 feet wide running along the east side of the school. Such a strip of land would be impossible to irrigate and would be too narrow for economical operation of the very large farm implements which are common in eastern Colorado. The option also covered a strip of land approximately 455 feet long and the width of a town street which would run from the northeast corner of the school plot north to a point on the center line of an *20 extension of 16th Street in Burlington. In addition, petitioner agreed to grant an easement across the remainder of the northwest quarter of the three-fourths section extending "from said tracts westward to U.S. Highway No. 385." The easement was to be located by petitioner. Having obtained an option on the desired land, the school board submitted the issue to the electorate of the school district in the form of a referendum on school bonds. The voters rejected the bond issue. Having ascertained that many members of the community considered the plans for the school to be unnecessarily elaborate and expensive, the school board decided to change architects and develop another plan for the school. The new architect chose the same location for the school on petitioner's property with the one exception of moving the east and west boundaries of the tract approximately 300 feet easterly so that the new location abutted the easterly edge of petitioner's property. The school board renegotiated a purchase with petitioner and an agreement was reached incorporating the changes in location at a reduced price of $17,000. The issue was voted on again by the electorate and this time was approved. *21 It was most desirable for the new school site to be annexed to the city of Burlington 1375 for police protection and access to city utilities. However, under Colorado law, only land which is contiguous with an existing municipality may be annexed. Because of this requirement and in an effort to cooperate with the school board, petitioner agreed to allow that portion of his property lying immediately to the north of the school site and abutting the southerly boundary of Burlington to be annexed to the city. The land lying between the school site and the town was too small to farm economically. The plot is 480 feet by 1,079 feet or about 12 acres. Farm machines used in the Burlington area are often 50 feet wide. Also, it would be prohibitively expensive to put irrigation pipes under a street (which would lead west from the school site to Highway 385 in accordance with the easement) to irrigate such a small tract. Also, the school board was desirous of having the school surrounded by residential property. When first requested to sell property to the school district for the school, petitioner had questioned why the school board was unwilling to have the property bordering on the *22 commercial areas of the city and had been advised of the desirability of having the school surrounded by a residential area. For these reasons, petitioner suggested to the surveyor who was surveying the school site prior to annexation that his small plot of land be plotted for residential use. Petitioner suggested that the plot be divided into three blocks, each being divided by an alley and each block containing 30 lots, each 25 feet wide and either 117 feet or 140 feet deep, 15 lying on either side of each alley. The blocks would be separated by streets in line with existing streets in the city of Burlington. Petitioner and the school board each paid one-half of the total surveying costs. The school site and petitioner's plot were annexed to Burlintgon December 2, 1963. Petitioner conveyed the school site to the school district on December 11, 1963. Petitioner's small plot was described in the ordinance approving annexation dated December 2, 1963, as the Parmer Addition, hereinafter referred to as the first addition. [1]
Petitioner had the streets in his first addition *23 curbed and guttered and he installed a sanitary sewer line to serve all three blocks. The town of Burlington would not pave a street unless it had curbs and gutters nor would the town install sewer lines. Septic tanks were banned by state health regulations. The town of Burlington desired that sewer lines be installed prior to street paving to prevent the later cutting of the pavement. Except for the sewer line, curbing and guttering on 18th Street, these improvements were not required of petitioner in order to complete the sale of the school site. Petitioner began to sell his lots. There was little need for advertising in a town the size of Burlington and generally buyers would come to petitioner on their own volition. Petitioner used "for sale" signs only twice, both times under circumstances when it appeared that all lots had been sold and he wished to dispel that idea. Certain conditions were placed on lot purchasers. Purchasers were required to build a house costing at least $10,000 and the house had to be completed within 18 months from the date of purchase. Petitioner had the option to repurchase the site at 80 percent of cost if the house was not completed within the specified *24 time and in one case did so. Petitioner did not use a real estate agent. He personally sold all the lots. Generally, three lots were purchased for each homesite. However, some purchasers acquired more than three lots for a homesite. On one occasion petitioner sold 12 lots to one purchaser for a homestite. Each lot sold for about $750. Petitioner computed the cost of each lot at $150.89, determined as follows: Cost basis in land
$ 3,280.00
Improvements
Cost of annexation
$ 317.44
Curb and gutter
5,937.00
Sewer line
3,669.00
Additional sewer cost 377.40
10,300.84
Total
$13,580.84
90 lots, cost per lot
150.89
Petitioner commenced the sale of lots in the first addition in 1964 and by 1968 had sold them all. Lot dispositions were as follows: Year
Lots coveyed
Gross Sales
1964
15
$ 8,700.00
1965
36
15,800.00
1966
18
19,649.00
1967 21
11,700.00
Totals
90
$55,849.00 1376 On July 6, 1965, the Colorado State Department of Highways brought a condemnation action against petitioner and other parties to acquire land for Highway I-70. The petitioner conveyed his portion of the land required on September 20, 1967. The *25 State Department of Highways provided access under Highway I-70 for well water from the well in the northwest quarter of petitioner's land to flow to the land south of the Interstate Highway. On January 16, 1967, petitioner sold to the Continental Oil Co. (CONOCO) for $70,000 an unimproved tract of 7 acres bounded on the south by Highway I-70 and on the west by U.S. Highway 385. This parcel is part of the northwest quarter of the three-fourths section purchased by petitioner on July 14, 1961. At the interchange of U.S. Highways 385 and I-70, Highway 385 passes over I-70 and does not come down to ground level for several hundred feet. There is a fence running parallel to Highway 385 at the edge of its right-of-way extending north for the interchange. One of the reasons CONOCO purchased so much land was in order to be far enough north of the interchange to have access to Highway 385. On September 25, 1967, petitioner sold for $35,000 to Russell Wilcox 1.474 acres of unimproved land immediately to the north of the CONOCO lot and facing Highway 385. The land was used for the construction of a Standard Oil Co. service station. Petitioner agreed when he sold the parcel of land to *26 CONOCO that he would install a sewer line to that property. In order to do this petitioner extended to the west a sewer that came out of the first addition approximately 150 feet south of the northern edge of the first addition. However, after this sewer was laid, it was determined that its use was not feasible because the land which CONOCO had purchased was sufficiently lower than the land at the northern end of the three-fourths section that if the sewer line were extended south to the CONOCO property it would lie too close to the ground level. Petitioner left the new sewer line in the ground and laid another one about 315 feet south of the first sewer line. Its path west formed an extension of Fay Street, the road on the southern edge of the first addition. The new sewer line was sufficiently deep that it could serve the CONOCO property. Petitioner agreed when he sold the land to Wilcox that he would open a street immediately to the north of the Wilcox plot extending from U.S. Highway 385 eastward. Petitioner delayed cutting the road through in order to preserve the land for farming. As a temporary expedient, petitioner cut a street running eastward from U.S. Highway 385 along *27 the northern edge of Wilcox's property for 300 feet, the depth of Wilcox's plot. The road then turned north to what is now Frank Street and eastwardly wardly along Frank Street. Frank Street follows the line of the first sewer which was laid to serve the CONOCO property. Petitioner installed curbs and gutters along this road serving the Wilcox property. Although the written agreement gave petitioner the right to locate the easement for the access from the school land to Highway 385, petitioner allowed the school board the right to choose the location of the easement. The school board asked that the access road extend west from the northwest corner of the school block to U.S. Highway 385, which was a westward extension of Fay Street and the southern boundary road of the first addition. This extension of Fay Street followed the line of the second sewer laid to service the CONOCO property, and linked up with the 300 foot road segment immediately north of the Wilcox property. This new road, also designated as Fay Street, effectively cut off the land lying to the north of it and made irrigated farming economically impractical. Dry farming continued in this area until 1970. The land *28 lying north of Fay Street and west of the first addition was platted by petitioner as residential and commercial property during 1967. This tract, comprising 16 acres, was known as Parmer's Second Addition. Sewer lines were in existence having been laid by petitioner to serve the CONOCO property. Frank Street, extending along the route of the first sewer line, was curbed and guttered. In 1968 petitioner petitioned the town of Burlington for the annexation of the second addition. On April 1, 1968, the Board of Trustees of the town of Burlington approved the annexation of the second addition within the corporate limits of the town. On April 3, 1968, the plat pertaining to the second addition was filed. The 16 acres in the second addition were platted into 39 residential lots and 5 commercial lots. The residential lots are larger in size than those in the first addition. 1377 Residential lots numbered 14 through 26 of the second addition front on Fay Street. The cost of installing the sewer up Fay Street and the curbs and gutters along Fay and Frank Streets from U.S. Highway 385 to the rear of the Wilcox property and then north was borne by petitioner. He included this cost as *29 a part of his cost in connection with the sale of the plot to CONOCO, and not in the cost of improvements to the second addition. The following improvements were made to the 27 remaining lots on the dates and at the costs indicated: Cost re:
Date paid
Purpose
27 lots
Mar. 2, 1967
Sewer
$2,725.27
July 6, 1967
Curbs and gutters
3,355.75
May 3, 1968
Curbs and gutters
498.88
Apr. 15, 1968
Legal fees
165.68
Mar. 14, 1968
Surveying 135.00
$6,880.58
Petitioner's cost basis in these 27 lots in the second addition is as follows: Cost basis in land
$2,187.00
Improvements 6,880.58
Total $9,067.58
27 lots, cost per lot
$ 335.84
Petitioner began to receive inquiries about the new lots. Therefore he placed a small advertisement in the newspaper for 2 weeks, stating that the lots were ready for sale. Sales of lots in the second addition commenced during 1968. Three lots in the second addition were sold in 1968 for $2,500 each. There was one sale in 1969. At the time of the annexation of the school block and the first addition, Burlington's 18th Street was dedicated for public use from its dead end at the old southerly *30 boundary of Burlington south to the I-70 Highway right of way. Since 1964 the street has been open to the south slightly beyond the location of the school building. A motel is being constructed on the CONOCO property and the State Highway Department has removed stretches of fence along Highway 385 for access. Petitioner did not know that the State would remove the fence. For the 3 years here in issue, petitioner's net profits from his own farming, his farm rental income, and his lot sales are as follows: Net profit per returns
Year
Farming
Farm rent
Lot sales
1966
$ 6,530.85
$25,168.73
$16,496.95
1967
8,936.24
19,228.10
7,584.40
1968 2,652.93
25,213.90
6,290.06
$18,120.02
$69,610.73
$30,371.41
The farm lease to the Hinkhouse Brothers dated September 26, 1963, reserves to petitioner "the building and its site in the Northwest corner of the above described land and the privilege of using or selling building sites on the north side of the Northwest Quarter Section of this land." In all the years that petitioner had been a farmer, only once prior to his acquisition of the three-fourths section in 1961 had he sold any land. This one *31 instance occurred when he was forced to buy a quarter section of land which he did not need or want in order to acquire a quarter section he needed for his farming business. On July 20, 1967, 2,041 bushels of winter wheat were delivered to The Burlington Elevator, of which 1,938 bushels came from Leon Silkman and 103 bushels came from E. E. Morrell. These bushels were petitioner's share of wheat harvested during 1967 pursuant to a farm lease with Silkman and one with Morrell, both tenant farmers on petitioner's land. On January 5, 1968, at petitioner's direction, grain warehouse receipt No. 86 representing the 2,041 bushels was issued by The Burlington Elevator to the Limon Bible Chapel Association, Inc., hereinafter referred to as Limon Bible. On January 6, 1968, a check in the amount of $2,543.50 was issued by The Burlington Elevator to Limon Bible in payment for the wheat represented by warehouse receipt No. 86. During 1967, 5,018 bushels of wheat were delivered to the Plains Grain Co. The wheat was grown on land owned by petitioner and it was his share pursuant to leases or agreements with the following tenant farmers: Silkman, Stasser, Morrell, and Hinkhouse Brothers. On January 5, 1968, at *32 petitioner's direction, grain warehouse receipt No. 578 was issued by the Plains Grain Co. to Limon Bible representing the 5,018 bushels. On January 6, 1968, Plains Grain Co. issued a check in the amount of $6,252.43 to Limon Bible in payment for the wheat represented by warehouse receipt No. 578. On February 20, 1968, 2,825 bushels of yellow corn were delivered to The Burlington Elevator by E. S. Graham. These bushels were petitioner's share of corn harvested during 1967 pursuant to a farm lease with E. S. Graham, a tenant farmer. On March 14, 1968, grain warehouse receipt No. 94 was issued by The Burlington Elevator to petitioner representing the 2,825 bushels. On March 14, 1968, the warehouse receipt was negotiated by petitioner to Limon Bible and on the same date a check in the amount of 1378 $3,051 was issued by The Burlington Elevator to Limon Bible in payment for the corn represented by warehouse receipt No. 94. On November 17, 1968, 1,394 bushels of yellow corn were delivered to the Plains Grain Co. by E. S. Graham. These bushels were petitioner's share of corn harvested during 1968 pursuant to a farm lease with E. S. Graham, a tenant farmer. On December 7, 1968, grain *33 warehouse receipt No. 620 was issued by the Plains Grain Co. to petitioner repesenting the 1,394 bushels. On the same day the warehouse receipt was negotiated to Limon Bible. Two days later a check in the amount of $1,491.58 was issued by Plains Grain Co. to Limon Bible in payment for the corn represented by warehouse receipt No. 620. All of the grain donated by petitioner during 1968 was identified by him as cropshares. He carefully documented which grain he was donating. Grain storage rates applicable when the grain is first placed in storage remain constant even though the current rate may change. The grain which petitioner donated carried a storage rate of 1 cent or higher per bushel. Petitioner had in storage in 1968 some grain which had been produced by him from his own farming activity and placed in storage in 1966 which carried a rate of one-half cent per bushel. Petitioners on their Federal income tax returns for the years 1966, 1967, and 1968 reported gains on the sale of lots in the first and second additions in the amounts of $16,496.95, $7,584.40, and $6,290.06, respectively, as long-term capital gains. Respondent in his notice of deficiency determined that these gains *34 constituted ordinary income since the property sold was property held for sale to customers in the ordinary course of petitioner's trade or business. Respondent in his notice of deficiency treated the sale of 7 acres to CONOCO and 1.474 acres to Wilcox in 1967 as installment sales of a capital asset and the gain from the sales to be taxable as long-term capital gain on an installment basis. Although petitioners had reported these sales on a "cost recovery" method, this adjustment by respondent is not in issue in this case. On their 1968 income tax return petitioners claimed a charitable contributions deduction in the amount of $13,338.51 for "grain donation" to a church organization. Respondent made no adjustment to the contributions deduction claimed, but in the notice of deficiency, respondent determined that the value of the crop shares donated by petitioner in 1968 and sold by the donee in 1968 was taxable to petitioner as crop rents. Petitioners did not include in their income as reported on their return for 1968 the $13,338.51 received by the donee upon the sale of the warehouse receipts. Opinion The gain petitioner received from the sale of lots in the years here in issue *35 was long-term capital gain unless these lots failed to meet the definition of capital assets because of being "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" within the meaning of section 1221, I.R.C. 1954. Therefore, our issue here is whether during the years 1966, 1967, and 1968 petitioner was engaged in the "trade or business" of selling lots, and if so, were the lots held primarily for sale in the course of that business. It is well settled that the determination to be made in this case is a question of fact. Commissioner v. Tri-S Corporation, 400 F. 2d 862 (C.A. 10, 1968), affirming 48 T.C. 316 (1967). For this reason we have made detailed findings of fact. Petitioner argues that he is a farmer and that his plans for the agricultural use of the three-fourths section he purchased in 1961 were frustrated by the school board's decision to place the new high school on his property and by the construction of the interstate highway. Because of these events the land in both the first and second additions became useless for farming and therefore his only feasible alternative *36 was to dispose of it. The sale of the lots was, according to petitioner, the passive liquidation of land not suitable for farming, and therefore the gain realized was properly reported as long-term capital gain. Respondent argues that even though petitioner is a farmer, he is also in the real estate business. He points to the activities which petitioner engaged in to sell the lots and says these are the indicia of a real estate dealer. In numerous cases we have stated that in determining whether a taxpayer is engaged in the trade or business of selling real property, we must consider the purpose for 1379 which the property was acquired and the purpose of disposing of it, the activities of the taxpayer and those acting in his behalf or under his direction, such as making improvements or advertising, the continuity and frequency of sales as distinguished from isolated transactions, the substantiality of sales as compared to other sources of income, and any other fact which tends to indicate whether the sale or transaction was in furtherance of an occupation of the taxpayer. See James G. Hoover, 32 T.C. 618, 625 (1959). *37 The tests are aids in determining whether a business exists but, in the last analysis, the problem is "to differentiate between the 'profits and losses arising from the everyday operation of a business' on the one hand ( Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 52, 76 S. Ct. 20, 24, 100 L. Ed. 29) and 'the realization of appreciation in value accrued over a substantial period of time' on the other. ( Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S. Ct. 1497, 1500, 4 L. Ed. 2d 1617)." Malat v. Riddell, 383 U.S. 569, 572 (1966). Our statement in S. O. Bynum, 46 T.C. 295, 298 (1966) is equally applicable here: The question or issue for our determination under each of the above-noted sections of the Code is singular; it is whether the taxpayers during the years in issue were in the real estate business and selling property held by them primarily for sale to customers in the ordinary course of such trade or business. * * * An analysis of the facts reveals that after petitioner acquired the 455-acre tract with a view to using it as farmland, events *38 occurred which were beyond his control which rendered the use of a portion of the land for this purpose not feasible. Petitioner sold the school plot because he was being subjected to pressure to provide the land. He was certainly aware that the school board could exercise its powers of condemnation. His sincere desire to limit his loss of farmland is evidenced by his displeasure over being left with a strip of land between the eastern boundary of the school plot and the eastern border of his property as proposed in the option dated May 10, 1962. A second event over which petitioner had no control was the construction of Highway I-70 and its interchange with U.S. Highway 385. The fence which was constructed on the north side of the interchange seemingly blocked access to Highway 385 for several hundred feet. We believe petitioner's assertion that he did not know when he bought the land that I-70 was planned to cross the land or that the school district was considering this land as a site for the new school. We also believe his statement that he did not know that the State Highway Department would remove a portion of the fence on the interchange of I-70 and Highway 385 upon request. *39 As a result of the school board's purchase, petitioner was left with a 12-acre plot which was so situated that it could not be irrigated and was, in fact, too small to farm. This plot, the first addition, had to be annexed to the Town of Burlington so that the school could receive city utilities and services. Also, petitioner was aware of the desire of the school board to have residential property around the school. In fact the only feasible use of the 12-acre plot after the sale to the school was as residential property. The facts in this case are quite similar to the facts in Wellesley A. Ayling, 32 T.C. 704, 708 (1959). That case involved the liquidation of property that was purchased unwillingly and required subdivision to protect the value of the remainder of the land. This case involves property which petitioner was forced to annex to the Town of Burlington to enable the school to be within the city limits and which had no use to petitioner after its annexation. It was therefore necessary for petitioner to dispose of the property. The only reasonable disposition of the property was its sale for residential use. The advertising done by petitioner was limited, and *40 sales were made to persons who approached petitioner requesting to buy lots. Petitioner spent comparatively little time in connection with sale of the lots. Even though the plot contained 90 lots 25 feet wide, each purchaser generally bought three lots as a building site and some customers bought more than three lots as a building site. Petitioner sold in the first addition not over 27 building sites over a period of 4 years. Such a small number of sales over such an extended period is not indicative of a business. Also, petitioner's placing as the minimum cost of a house to be built on the lots at the low figure of $10,000 was obviously to protect the area surrounding the school rather than to cause the value of his lots to increase. Finally the fact that petitioner sold the 12 1380 acres in residential lots for a little less than $56,000 as compared to a sale of 7 acres for nonresidential use for $70,000 and about 1 1/2 acres for $35,000 for commercial use, clearly indicates that the sale of the property as residential lots was necessitated by the location of the school and not from a business operation of petitioner's. Petitioner's property bordered on commercial property, but *41 the school board was unwilling to have the school land at this border of petitioner's property because of the desirability of having a school surrounded by residential property. Petitioner was obligated to grant an easement to the school district to connect with Highway 385. He was not obligated to build a road or install curbs and gutters. Petitioner might have granted the school a less desirable location for the access to Highway 385 and left the building of the road to the school. However, petitioner, not being aware that a connection could be made with Highway 385 at its interchange with I-70 by having part of a fence removed, had promised Russel Wilcox that he would cut a road through from the east to provide access to the property sold to him from Highway 385. In providing for this road, it was feasible to grant the school district a desirable easement and build this road to the school. The record clearly indicates petitioner's desire to accommodate the school board. This is an understandable reaction for a life long resident of a city of between 2,500 and 3,000 residents. Once the easement of the school board was placed on Fay Street, the desirable location for it, the only *42 feasible use for the property left cut off from the remaining farm property was sale in lots. Therefore, the second addition was platted and annexed to the Town of Burlington in 1968. Sales from this section have been sporadic. Considering the evidence as a whole, we conclude that petitioner was not engaged in the trade or business of a real estate dealer or of selling residential lots in the years here in issue. Therefore, we hold that petitioner properly reported his gain from the sale of lots in the years here in issue as long-term capital gain. It will not be necessary for us to discuss the effect of section 1237 on the taxable year 1968 in light of our decision on the second addition lots. Petitioner contends that he should not be required to include in his 1968 income the amounts received by Limon Bible for the grain receipts he gave to it. Petitioner asserts that respondent's action in increasing his 1968 income by these amounts is not only erroneous but is also an arbitrary attempt to change petitioner's method of accounting from the cash method to an accrual method. Petitioner further contends that if he is required to include the amounts received by Limon Bible for *43 the receipts in his income, he will be deprived of property without due process of law; and that to draw a distinction between donations to a charity of crop shares and personally grown crops is an unconstitutional deprivation of equal protection under the law. In our view the instant case is not distinguishable from Clyde G. Tatum, 46 T.C. 736 (1966), affirmed 400 F. 2d 242 (C.A. 5, 1968). There, we held that the taxpayers were required to include in their gross income for the years 1961 and 1962 the amounts of cash received by charitable organizations from the sale of donated sharecrop rents in such years. We supported the Commissioner's Revenue Ruling 63-66, 1963-1 C.B. 13, and rejected the result reached in Peterson v. United States, an unreported case ( E. D. Wash. 1965, 65-2 USTC 9674). Petitioner argues that the Tatum case is distinguishable from this case. He points to the statement by the United States Court of Appeals for the Fifth Circuit in affirming our decision that, The Tax Court did not state in specific terms a conclusion that petitioners are not farmers, but reading its decision as a whole we are of the opinion *44 such a factual determination necessarily underlay its disposition of the case. 400 F. 2d at 246. Earlier in the decision, the Fifth Circuit noted: If petitioners in fact are farmers they are entitled to be treated as any other farmer and need not include the value of the crop shares in gross income. A factual conclusion that petitioners are farmers would end the matter and would pretermit the legal question whether crop shares are income assets or appreciated property. 400 F. 2d at 245. Petitioner states that since he is a farmer, the Tatum case supports his position that he should not be required to include in income in 1968 the amounts received by Limon Bible for the grain receipts he gave it. Petitioner is, of course, a farmer with 1381 respect to the land he farms himself and those crops which are the result of his own labors. He is in exactly the same occupation with respect to the land he leases on a sharecrop basis as was the taxpayer in Tatum. It is well settled that a person can be in more than one business at the same time. DiLisio v. Vidal, 233 F. 2d 909 *45 (C.A. 10, 1956). Whether petitioner is a farmer or a landlord with respect to the lands farmed by his tenants is a factual question. It is our finding that with respect to the lands operated by tenants, petitioner is a landlord. The written and oral agreements between the farm operators and petitioner are typical sharecrop farm leases. The minor control exercised by petitioner over the tenants does not transform the landlord-tenant relationship to a joint venture. Our opinion is fortified by Cullison v. United States, an unreported case ( E.D. Ark. 1970, 27 A.F.T.R. 2d 71-418, 71-1 USTC 9136) in which the owner of 17,000 acres of farmland who personally farmed between 300 and 325 acres per year in a rice crop, was found to be a landlord with respect to his remaining property which was farmed by several sharecrop tenants in soybeans. See also United States v. Myra Foundation, 382 F. 2d 107 (C.A. 8, 1967), cited in Cullison v. United States, supra. Also the agreements in this case between petitioner and his tenants were not different in substance from the agreements between the taxpayer and his tenants in Clyde G. Tatum, supra. The evidence *46 conclusively shows that the grain donated by petitioner to Limon Bible was in fact cropshares and not grain grown by petitioner. In fact petitioner does not contend to the contrary as a factual matter. Petitioner was able to select grain from specific ledger accounts at the public warehouses and donate that specific grain. He selected the cropshare grain to donate. Petitioner argues, however, that since he might have selected grain he grew to make the donation and probably would have had he been aware that donating the cropshare grain might involve the imposition of substantially additional taxes, he should be treated as if he donated grain he had grown. In Television Industries Inc. v. Commissioner 32 T.C. 1297 (1959), the Court noted: The Commissioner is justified in determining the tax effect of transactions on the basis in which taxpayers have molded them, * * * It would be quite intolerable to payramid the existing complexities of tax law by a rule that the tax shall be that resulting from the form of transaction taxpayers have chosen or from any other form they might have chosen, whichever is less. We have, in numerous cases, held that *47 the tax consequences of a transaction depend on what was done and not on what might have been done. See Gus Russell, Inc., 36 T.C. 965, 968 (1961), and cases there cited. Petitioner further contends that the Tatum case is distinguishable from this case since in the Tatum case the crops were received by the taxpayer-landlord, donated to charitable organizations, and converted to cash by the donees all in the same tax year, whereas, except for the two warehouse receipts representing yellow corn, the grain represented by the warehouse receipts he donated to Limon Bible was delivered to the warehouse in 1967 and not in the year 1968 when the gift of the receipt was made and the money for the receipt paid to Limon Bible. In Clyde G. Tatum, supra, we do not consider the problem which would arise if the assignment of cropshares and their sale by the donees occurred in different taxable years. However, we are not faced with that problem here either since the assignments and sales all occurred in 1968. It was the year of delivery of the crops to the warehouse which was a different year in this case. Our holding *48 in Tatum makes it clear that the year of delivery of the crops to the warehouse is not of importance to the resolution of the issue. In that case we quoted with approval the statement by the Court of Claims in Davison's Estate v. United States, 292 F. 2d 937, 942 (Ct. Cl., 1961) that: The lessor who has received crop-rent has of course received an asset of value, but as a matter of administrative convenience the recognition of this value as income is deferred until the crops are reduced to money. Crops received as rent exist in the hands of the lessor as a unique kind of property which can be described, like a right to receive future income, as a potential income asset. * * * The Fifth Circuit noted in Tatum v. Commissioner, 400 F. 2d 242, 247 (C.A. 5, 1968): 1382 Treas. Reg. sec. 1.61-4(a), (b)[2] accords to sharecrop landlords the privilege of waiting until the crop shares are reduced to money before recognizing the income. This accounting procedure is a rule of administrative convenience, made necessary by the absence of cash with which to pay the tax prior to a sale and by difficulties in abstract valuation of farm *49 products, but this rule of deferred reporting of income has no bearing on the underlying question whether potentially taxable income exists. * * * The shares are income items, but because recognition is postponed until they are reduced to money or its equivalent they are not immediately taxable. The holding in the Tatum case is clear that regardless of when the crop shares are delivered to the landlord, recognition of the realized income cannot occur until a later date, if at all. The landlord might feed his livestock with the grain crop shares and the respondent has conceded that the value of the crop would not represent rental income for Federal income tax purposes. Rev. Rul. 56-496, 1956-2 C.B. 17. However, we are concerned with what did happen, not what could have happened. Island Gas, Inc., 30 T.C. 787, 795 (1958). *50 The donation of the grain to Limon Bible and the sale of the grain were the events which brought about a recognition of the realized income. It is not necessary for us to decide which event was controlling because both occurred in 1968 for each of the transactions. The recognition of income to petitioner when the grain receipts are reduced to cash does not amount to an arbitrary change by respondent of petitioner's method of accounting as petitioner contends. Respondent here has not attempted to accrue income to petitioner. To the contrary, petitioner by donating crop shares which were sold by the donee in the same taxable year has exercised the unfettered power to dispose of that income which, by case law, is deemed analogous to its enjoyment. See Wood Harmon Corporation v. United States, 311 F. 2d 918, 921 (C.A. 2, 1963), and cases there cited. There is no merit to petitioner's assertion that the inclusion in his income of the money received by Limon Bible upon selling the grain donation deprives him of property without due process of law or deprives him of equal protection under the law. The distinction between the gift of owner-produced crops and the assignment *51 of crop share rents is real and reasonable and not one which must fall under a concept of equal protection. In Eleanor C. Shomaker, 38 T.C. 192, 200 (1962), we noted in answer to an argument attacking the constitutionality of section 71, I.R.C. 1954: Since in the Lester case the Supreme Court concluded that the wife was free to spend the moneys as she saw fit, and therefore had such power to dispose thereof as to be the equivalent of ownership of such moneys, we think it would necessarily follow that it could not be concluded that a tax upon her measured by such income would constitute the measuring of her tax by the income of another. * * * Similarly the income of petitioner in the instant case is not being measured by another's. The crop shares petitioner received constituted his own rental income. His subsequent transfer of the grain to Limon Bible and its sale of the grain does not alter the basic fact that petitioner received rental income. There is no deprivation of property without due process of law resulting from including this income in petitioner's taxable income in 1968. We sustain respondent on this issue. Decision will be entered *52 under Rule 50. 1383 Footnotes
1. This tract of land was specifically excluded from the lease to Hinkhouse Brothers dated September 26, 1963.↩
2. Sec. 1.61-4 Gross income of farmers. (a) Farmers using the cash method of accounting. * * * (5) Gross income from all other sources. * * * Crop shares (whether or not considered rent under State law) shall be included in gross income as of the year in which the crop shares are reduced to money or the equivalent of money.↩